UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JAMEL E. BEN ABDALLAH,

                              Plaintiff,

              -vs-                                          09-CV-0861-JTC

JANET NAPOLITANO, Secretary, United States
Department of Homeland Security,

                              Defendant.

_____

Plaintiff Jamel E. Ben Abdallah brought this action on October 5, 2009, against

Defendant Janet Napolitano, Secretary of the United States Department of Homeland

Security ("DHS"), alleging discriminatory discharge from his employment as a Customs and

Border Protection ("CBP") officer, in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII").  The parties have filed cross-

motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.

For the reasons that follow, defendant's motion is granted, and the case is

dismissed.

## BACKGROUND

Mr. Abdallah was born and raised in Tunis, Tunisia.  *See* Deft. Exh. 1 (p. 4).[1]  He

emigrated to the United States in January 2001, following his marriage in Tunisia to a U.S.

_____

[1]References to "Deft. Exh." are to the exhibits submitted to the record as attachments to the
Declaration of AUSA Michael S. Cerrone (Item 47), entered on the court's docket collectively as Items 47-
1 (Exhs. 1-12) and 47-2 (Exhs. 13-27).  For consistency, parenthetical references are to the consecutively
numbered pages of those Items as they appear on the docket (Item 47-1, pp. 1-93; Item 47-2, pp. 1-76).

citizen, Michelle Hulse, on September 16, 2000. He became a U.S. citizen in 2005. *Id.* (pp. 4, 7).

Plaintiff began his employment with CBP in October 2007 as an intern under the Federal Career Intern Program ("FCIP"), which is a 2-year "excepted service" program established to "provide the career interns with formal training and developmental opportunities to acquire the appropriate agency-identified competencies needed for conversion" to a career-track "competitive service" position. 5 C.F.R. § 213.3202(o)(9) (effective May 11, 2006 to July 9, 2012). Plaintiff signed an FCIP Employment Agreement on October 8, 2007, acknowledging that:

> Career Interns serve a trial period of 2 years. During this time, the Intern's performance, development, conduct, and general suitability for continued employment will be assessed. Employment may be terminated during this time due to work performance or conduct reasons. Interns are not required to serve an additional trial or probationary period following conversion to the competitive service.
> …
> There is no guarantee or entitlement to conversion.

Deft. Exh.2 (p. 28).

Upon completing training at the Federal Law Enforcement Training Center ("FLETC"), plaintiff was assigned to the Port of Buffalo in the position of CBP Officer. On March 17, 2008, plaintiff signed an "Acknowledgment of Receipt of Conduct Information" form indicating that he received several documents outlining the CBP's policy on employee ethics, including the CBP Standards of Conduct. Deft. Exh. 4 (p. 43). Section 5.1 of the CBP Standards of Conduct explains that:

> Every CBP employee is required to: (1) know the Standards of Conduct and their application to his or her behavior; (2) seek information from his or her supervisor if unsure of the application of the Standards of Conduct; (3)

adhere to the Standards of Conduct; and (4) be aware of the consequences of violation of the Standards of Conduct ....

Deft. Exh. 3 (p. 31). In addition, section 6.4.2 of the CBP Standards of Conduct states, "[w]hen directed by competent authority, employees must truthfully and fully testify, provide information, or respond to questions (under oath when required) concerning matters of official interest that are being pursued administratively." *Id*. (p. 32).

In July 2008, the DHS Office of Inspector General ("DHS-OIG")[2] opened an investigative file based on information received by the DHS Joint Intake Center from a confidential source ("CS") that "a CBP Officer trainee slated to begin working in Buffalo … has indicated a willingness to assist in arranging a fraudulent marriage." Deft. Exh. 5 (p. 45). The CS reported that the subject was from Tunisia, and that the CS had known the subject for some time due to meeting him occasionally at an Arab grocery in Lackawanna. The CS subsequently identified the subject as Jamel Ben Abdallah—the plaintiff—and reported that further contact had revealed information regarding possible anti-American views expressed by one of plaintiff's fellow CBP trainees at FLETC, a man identified as Hamad Abdelqader. *See* Deft. Exh. 6 (pp. 51-55); *see also* Deft. Exhs. 8 & 9 (pp. 81, 83).

The investigation was assigned to Special Agent Richard Ford ("SA Ford"). On September 16, 2008, SA Ford and Immigration and Customs Enforcement ("ICE") Special Agent Mark Reimann ("SA Reimann") traveled to St. Petersburg, Florida, to interview Faycel Ben Hajmeftah, who was listed as a reference on plaintiff's CBP employment

_____

[2]DHS-OIG serves primarily as an internal affairs agency that investigates allegations of misconduct by employees of DHS and its component agencies. *See* Deft. Exh. 6 (p. 69).

application. SA Ford's "Memorandum of Activity" regarding this interview indicates that Mr. Hajmeftah is also from Tunisia, and met plaintiff when they worked together at Salem's Gyro restaurant in St. Petersburg. SA Ford noted that a subsequent review of the Standard Form 86 employment questionnaire and Background Investigation Personal Interview Worksheet in plaintiff's personnel file revealed no reference to his employment at Salem's Gyro restaurant. *See* Deft. Exh. 10 (pp. 85-86).

On September 22, 2008, SA Ford and SA Reimann interviewed plaintiff at DHS offices in Buffalo. As reported in SA Ford's Memorandum of Activity regarding this interview, plaintiff was given a *Beckwith/Garrity*[3] form, which he read and signed. Plaintiff admitted during the interview that, following his arrival in the United States, he worked at Salem's Gyro and another restaurant in St. Petersburg without reporting the income to tax authorities, and he omitted this information from his federal employment and background investigation documents. Deft. Exh. 11 (pp. 88-89). Plaintiff acknowledged his association with Mr. Abdelqader while at FLETC, but denied any direct knowledge of his having expressed anti-American sentiment. Plaintiff also stated that he would voluntarily submit

---

[3]Referring to *Beckwith v. United States*, 425 U.S. 341 (1976), and *Garrity v. New Jersey*, 385 U.S. 493 (1967). The *Beckwith/Garrity* form utilized by DHS (INV FORM-27) states:

This interview is voluntary.

You have the right to remain silent if your answers may incriminate you.

Anything you say may be used against you as evidence both in an administrative proceeding or any future criminal proceeding.

If you refuse to answer the questions posed to you on the grounds that the answers may incriminate you, you cannot be discharged solely for remaining silent. However, your silence may be considered in an administrative proceeding for its evidentiary value warranted by the facts surrounding your case.

Deft. Exh. 14 (p. 5).

to a polygraph examination. *See id.*; *see also* Deft. Exh. 6 (pp. 70-71). Following the interview, plaintiff signed a sworn statement acknowledging that he knowingly failed to disclose his undocumented employment in St. Petersburg to CBP, both on his online employment questionnaire and during his pre-employment personal interview. *See* Deft. Exh. 12 (pp. 91-93).

On September 30, 2008, SA Ford and SA Reimann interviewed plaintiff's father-in-law, Malcolm Hulse, at Mr. Hulse's residence in Medina, New York. As reported in SA Ford's Memorandum of Activity regarding this interview, Mr. Hulse related the circumstances of his daughter's relationship with plaintiff, their wedding in Tunisia, and their relocation to the United States. Pltff. Exh. 2 (p. 20).[4] According to SA Ford, "Hulse stated the [plaintiff] was originally of the Muslim faith but later converted to Catholicism while in the U.S." *Id.*

On October 2, 2008, plaintiff voluntarily submitted to a polygraph test, which was conducted at the United States Secret Service ("USSS") field office in Buffalo by USSS Special Agent Donald Witham ("SA Witham"). Plaintiff signed several forms, including a *Beckwith/Garrity* Advice of Rights (Deft. Exh. 14 (p. 5)); a notice of *Miranda* rights (Deft. Exh. 15 (p. 7)); and a "Polygraph Examination Statement of Consent" form indicating his voluntary "consent to be interviewed and submit to a Polygraph Examination in connection with an investigation concerning national security." Deft. Exh. 16 (p. 9). SA Witham reported that "Series I was administered and evaluated as Deception Indicated to relevant

---

[4]References to "Pltff. Exh." are to the Exhibits submitted to the record as attachments to the Declaration of Charles L. Miller, II, Esq. (Item 52-3), entered on the court's docket collectively as Item 52-4 (Exhs. 1-10). For consistency, parenthetical page references are to the consecutively numbered pages of Item 52-4 as they appear on the docket (pp. 1-115).

question pertaining to terrorist activity." Deft. Exh. 13 (p. 3). Upon being advised of the results of the initial series of questions, plaintiff "stated that he wished to terminate the examination to consult with an attorney." *Id.*

Later on October 2, 2008, plaintiff reported to work and told his immediate supervisors, Kevin Sekuterski and Patricia Janicki, that he was being harassed by DHS investigators. *See* Deft. Exh. 18 (p. 14). Plaintiff was "granted leave to return home and collect his thoughts." *Id.*. Upon returning to work the next day, plaintiff was informed by his supervisors that they had discussed the matter with Chief CBP Officer John Madsen and were advised that CBP Internal Affairs was conducting an investigation into plaintiff's conduct. Officer Sekuterski instructed plaintiff to cooperate with the investigation, and placed plaintiff on restricted duty until further notice. *Id.*

On October 28, 2008, SA Ford and SA Reimann conducted a further interview of plaintiff at the CBP's Peace Bridge offices. *See* Deft. Exh. 20 (p. 28). Prior to the start of the interview, plaintiff was presented with an Advice of Rights (*Kalkines*[5]) form, which he

---

[5]Referring to *Kalkines v. United States*, 473 F.2d 1391 (Fed.Cl. 1973). The *Kalkines* form utilized by DHS (INV FORM-26) states:

> You are going to be asked a number of specific questions concerning the performance of your official duties.
>
> You have a duty to answer these questions.
>
> U.S. Department of Homeland Security disciplinary proceedings resulting in your discharge may be initiated as a result of your answers.
>
> Neither your answers nor any information or evidence which is gained by reason of such statements can be used against you in any criminal proceedings except a prosecution for false statements made during this interview.
>
> You are subject to discipline, including dismissal, if you refuse to answer or fail to respond truthfully to any questions.
>
> You are subject to criminal prosecution if you make false statements or give false

read aloud and signed at 10:45 a.m.  *See* Deft. Exh. 21 (p. 30).  Several minutes into the interview, plaintiff Advised SA Ford that he declined to participate any further, and hand wrote on the Advice of Rights form: "I don't wish to participate in this interview JB 11:05, 10/28."  *Id.*; *see also* Deft. Exh. 20 (p. 28).

SA Ford immediately notified Chief CBP Officer John Madsen ("Chief Madsen"), plaintiff's second line supervisor, about plaintiff's unwillingness to participate in the interview.  *See* Deft. Exh. 22 (pp. 32-36).  Chief Madsen entered the interview room and questioned plaintiff about whether he was aware of the consequences of his actions.  *Id.* (p. 33).  Plaintiff replied that he understood he could be disciplined, including removal from service.  *Id.*  Chief Madsen then informed CBP Port of Buffalo Director Joseph Wilson ("Port Director Wilson") that plaintiff had decided not to participate in the interview.  *Id.*

By letter dated November 3, 2008, Port Director Wilson advised plaintiff that his employment with CBP was being terminated because he "refused to cooperate in a [DHS] investigation conducted by the [OIG]" despite full notice and explanation of his rights and obligations.  Deft. Exh. 23 (p. 38).  The letter advised further that:

> You may raise any allegation that this action was taken against you in whole or in part because of discrimination based on race, color, religion, national origin, sex, age or disabling condition under the provisions of 29 C.F.R. 1614.  To do so you must consult an Equal Employment Opportunity Officer within forty-five  (45) days following your receipt of this letter.

*Id.*

---

answers during this interview.

Deft. Exh. 21, p. 30.

Plaintiff contacted CBP's Equal Employment Office on December 1, 2008.[6]  On February 25, 2009, plaintiff filed an "Individual Complaint of Employment Discrimination" with DHS, along with a "Designation of Representative and Limited Power of Attorney" appointing Lindy Korn, Esq., as his representative.  Deft. Exh. 26 (p. 58).  The administrative complaint asserts claims of discrimination on the basis of religion and national origin (Tunisia).  *Id.* at ¶ 15 (p. 56).  After 180 days passed since the filing of his administrative complaint, plaintiff commenced this action on October 5, 2009, asserting claims of disparate treatment on the basis of race, religion, and national origin, hostile work environment, and retaliation, all in violation of Title VII.  *See* Items 1, 6.

Following an extended discovery period, defendant moved for summary judgment seeking dismissal of the complaint in its entirety.  Upon review of the record presented by way of the parties' written submissions, and for the reasons that follow, defendant's motion is granted.

## DISCUSSION

## I.  Summary Judgment

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for

---

[6]At ¶ 19 of the administrative complaint form, in the space provided for "Date You Contacted and EEO Counselor," plaintiff stated "Yes," without actually identifying the date of contact.  Deft. Exh. 26, ¶ 19 (p. 56).  However, he testified at his deposition in this action that he made initial contact with CBP's EEO office on December 1, 2008.  *See* Deft. Exh. 1, pp. 148-149 (pp. 25-26).  Plaintiff also indicated, at ¶ 22 of the form, that he received a "Notice of Right to File" on February 12, 2008.  Deft. Exh. 26, ¶ 22 (p. 56).  The court will construe this date to be properly alleged as February 12, 2009.

summary judgment remain unchanged.  *See, e.g., Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011); Fed. R. Civ. P. 56, Committee's notes to 2010 amendments.  Under those standards, the moving party bears the initial  burden of establishing that no genuine issue of material fact exists.  *Rockland Exposition, Inc. v. Great American Assur. Co.*, 746 F. Supp. 2d 528, 532 (S.D.N.Y. 2010), *aff'd*, 445 F. App'x 387 (2d Cir. 2011).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law …."  *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed …."  *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks and citation omitted), *quoted in Kaminski v. Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011).  In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

The Second Circuit has also held that, when deciding whether summary judgment should be granted in an employment discrimination case, the court "must take additional considerations into account." *Desir v. City of New York*, 2011 WL 5176178, at *1 (2d Cir. Nov. 2, 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). As stated in *Gallo*:

> A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Gallo*, 22 F.3d at 1224. Nonetheless, summary judgment remains appropriate in discrimination cases, as "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to … other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied*, 534 U.S. 993 (2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (affirming grant of summary judgment in favor of employer based on plaintiff's failure to produce evidence of pretext), *cert. denied*, 540 U.S. 811 (2003).

In support of her motion for summary judgment, defendant contends that several of plaintiff's Title VII claims—including claims based on allegations of hostile work environment and retaliation—are subject to dismissal for failure to comply with Title VII's time limitations and administrative exhaustion requirements. Defendant further contends

that plaintiff has failed to come forward with evidence sufficient to establish the elements of a Title VII disparate treatment claim.  These contentions are discussed in turn.

## II.     Title VII

Title VII makes it unlawful for an employer, including the federal government, "to fail to hire or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Title VII is the exclusive remedy for discrimination by the federal government on the basis of race, religion, sex, or national origin."  *Boyd v. United States Postal Service*, 752 F.2d 410, 413-14 (9th Cir. 1985) (quoted in *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir. 1996)).

### A.     Exhaustion/Timeliness

As a prerequisite to bringing a Title VII action, a federal employee must timely exhaust administrative remedies by complying with the requirements set forth in the EEOC regulations at 29 C.F.R. § 1614.101 *et seq.*  *See Mathirampuzha v. Potter*, 548 F.3d 70, 74–75 (2d Cir. 2008).  Specifically, the EEOC regulations require that the aggrieved employee consult with an EEO counselor at the relevant agency within 45 days of the alleged discriminatory act.  29 C.F.R. § 1614.105(a)(1); *see Mathirampuzha*, 548 F.3d at 75.  This initial 45–day period "serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred."  *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d

Cir. 2001); *see also Forde v. Donahoe*, 2012 WL 1020038, at *14 (E.D.N.Y. March 26, 2012).

In this case, although the record contains no specific supporting documentation in this regard, the parties agree that plaintiff sought initial counseling with the EEO office on December 1, 2008. Accordingly, under 29 C.F.R. § 1614.105(a)(1), any claims based upon conduct related to events that occurred before October 16, 2008 (45 days prior to initiation of administrative review)—including plaintiff's claims that defendant violated Title VII by subjecting him to an investigative interview on September 22, 2008 and a polygraph examination on October 2, 2008, and by placing him on restricted duty on October 3, 2008—are time barred. *See e.g.*, *Pollock v. Chertoff*, 361 F. Supp. 2d 126, 135 (dismissing Title VII claim where plaintiff sought EEO counseling more than 45 days after termination; court "cannot dispense freely with the 45-day time limit, which the Supreme Court has held must be strictly construed.").[7]

In addition, in cases where the employee failed to pursue a particular claim at the administrative level, "the federal court generally lacks jurisdiction to adjudicate that claim." *Fitzgerald*, 251 F.3d at 359. Even as to claims not expressly pursued before the administrative agency, however, the court may consider them if they contain allegations that are "reasonably related" to the claims the plaintiff did assert before the agency. *Id*; *see also Mathirampuzha*, 548 F.3d at 75. "A claim is considered reasonably related if the

_____

[7]However, plaintiff is not precluded from relying on those prior acts as background evidence in support of timely claims of discrimination based on conduct alleged in the complaint to have occurred on or after October 16, 2008—*i.e.*, the interview on October 28, 2008, which resulted in his discharge on November 3, 2008. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim.").

conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge' that was made." *Fitzgerald*, 251 F.3d at 359-60 (quoting *Butts v. City of New York Department of Housing Preservation & Development*, 990 F.2d 1397, 1402 (2d Cir. 1993)).

At Paragraph 16 of the form administrative complaint in this matter, plaintiff checked the "religion" and "national origin" boxes as "the bases [he] believe[s] were relied on to take the actions described" in the factual allegations set forth in Paragraph 15. Deft. Exh. 26, ¶ 16. The box provided on the form for "retaliation/reprisal" was not checked. At the time the administrative complaint was filed, plaintiff was represented by experienced counsel well-versed in the nuances of federal employment discrimination law, yet nowhere in the complaint does plaintiff even mention the terms "hostile work environment" or "retaliation." Moreover, this court's reading of the allegations asserted in Paragraph 15 of the administrative complaint reveals no facts to support a plausible Title VII claim based on hostile work environment or retaliation, or to support a finding that such claims might reasonably have fallen within the scope of the EEOC investigation. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (citations and quotations omitted); *see also Fleming v. Verizon New York, Inc.*, 419 F. Supp. 2d 455, 463-64 (S.D.N.Y. 2005) (EEOC charge containing no reference to hostile work environment found "inadequate to define the scope of the EEOC investigation and serve as the predicate for claims in a federal lawsuit."); *Gambrell v. Nat'l*

*R.R. Passenger Corp.*, 2003 WL 282182, at *8 (S.D.N.Y. Feb. 3, 2003) ("Where the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive.").

Accordingly, plaintiff's hostile work environment and retaliation claims must be dismissed for failure to exhaust administrative remedies. As a result, the only claim remaining viable in this action is plaintiff's claim of disparate treatment, *i.e.*, that he was discharged from his employment with CBP on November 3, 2008 because of his national origin and/or religion.

## B. Disparate Treatment

Claims under Title VII seeking redress for disparate treatment in employment are analyzed under the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See, e.g., Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Phillips v. Marriott Int'l, Inc.*, 2010 WL 1269772, at *4 (E.D.N.Y. Mar. 30, 2010). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) he was in a protected group; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003); *Collins v. N.Y. City Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). "The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal." *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 506 (1993)); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (plaintiff's burden of proof at *prima facie* stage is "*de minimis*").

Once the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507 (internal quotation marks omitted).

Upon the defendant's proffer of a legitimate non-discriminatory reason for its employment action, "the presumption of discrimination arising with the *prima facie* case drops from the picture … [and] the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510–11); *see also Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998). To demonstrate pretext:

> The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock*, 224 F.3d at 42 (internal quotation marks, citations, and alterations omitted).

1.     *Prima Facie* **Case**

It is not disputed that Mr. Abdallah was a member of a protected group, or that he was qualified for the position he held when he was terminated.  However, defendant contends plaintiff has failed to establish that being subjected to two investigative interviews, a polygraph examination, and reassignment to restricted duty caused him to suffer an adverse employment action, or that any adverse employment action occurred under circumstances giving rise to an inference of discrimination.

a.     **Adverse Employment Action**

An employee sustains an adverse employment action if he or she "endures a materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Galabya v. New York City Bd. of Ed.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations and internal quotation marks omitted) (overruled on other grounds).  Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."  *Feingold*, 366 F.3d at 152 (citations and internal quotation marks omitted).  "A material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity. While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action."  *Pimentel v. City of New York,* 2002 WL 977535 at *3 (S.D.N.Y.  May 14, 2002) (internal quotations and citations omitted), *aff'd*, 74 F. App'x 146 (2d Cir. 2003).

As discussed above, the court has dismissed as time-barred any discrimination claims based on conduct which occurred prior to October 16, 2008 (including the investigative interview conducted on September 22, 2008; the polygraph examination conducted on October 2, 2008; and placing plaintiff on restricted duty on October 3, 2008). Furthermore, there is ample case law to support the finding that requiring an employee to participate in investigative interviews, excessive scrutiny of work performance, or reassignment to less desirable working conditions that cause no material disadvantage, "will not establish the adverse conduct required to make a *prima facie* case" of disparate treatment under Title VII. *Bright v. Le Moyne College*, 306 F. Supp. 2d 244, 253 (N.D.N.Y. 2004).

Plaintiff 's November 3, 2008 termination from CBP, however, clearly constitutes a materially adverse change in the conditions of employment sufficient to establish the third element of his *prima facie* case of disparate treatment under Title VII.

### b.    Inference of Discrimination

A closer question is presented with regard to whether plaintiff has come forward with proof sufficient to establish the fourth element of his *prima facie* case, *i.e.*, that the circumstances of his discharge give rise to an inference of discrimination. Defendant contends that no such inference can possibly be drawn in this case because plaintiff has not identified any similarly situated individuals outside of plaintiff's protected class who were employed by CBP at the Port of Buffalo and engaged in the same or similar conduct (*i.e.*, failed to cooperate in an official investigation) but received a lesser sanction. *See Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir. 2003) (showing that employer

treated plaintiff "less favorably than a similarly situated employee outside his protected group" is a recognized method of raising an inference of discrimination for purposes of making out *prima facie* case); *Rosinski v. American Axle & Mfg., Inc.*, 663 F. Supp. 2d 197, 204 (W.D.N.Y. 2009) (to raise inference of discrimination, plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself), *aff'd*, 402 F. App'x 535 (2d Cir. 2010).

However, while identification of a similarly situated comparator who was accorded more favorable treatment may be the preferred route toward an inference of discrimination for the purpose of establishing a *prima facie* case of disparate treatment, it is not the only route.

> Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or the timing of the discharge. … Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances "giv[e] rise to an inference" of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994).

Here, plaintiff contends that an inference of discrimination regarding his discharge from employment can be drawn from the following circumstances:

• No one else from plaintiff's FLETC class was questioned about Mr. Abdelqader (*see* Pltff. Exh. 9, pp. 111-12);

- The agents directed their questions to plaintiff on the basis of his alleged association with other Arabs (*see* Pltff. Exh. 4, p. 79);

- The agents asked plaintiff's father-in-law about plaintiff's religion (*see* Pltff. Exh. 2, p. 20);

- Plaintiff was initially identified by the CS as a Tunisian CBP officer in Buffalo (*see id*. at 48);

- SA Ford questioned plaintiff about his "path to citizenship" (Pltff. Exh. 4, p. 71);

- Plaintiff testified at his deposition that, during the polygraph examination, SA Witham accused plaintiff of being a terrorist (Pltff. Exh. 3, p. 61);

- After his discharge, ICE agents used plaintiff in an attempt to infiltrate Arab-owned grocery stores (Pltff. Exh. 4, pp 83-84).

*See* Item 52-1, pp. 27-30.

Considered in their totality in the light most favorable to plaintiff, these circumstances are sufficient to permit a rational finder of fact to infer discriminatory intent, at least for the limited purpose of finding that plaintiff has discharged his minimal evidentiary burden to establish a *prima facie* case of disparate treatment. The court therefore turns to the next step of the *McDonnell Douglas* analysis to determine whether defendant has sufficiently articulated a "legitimate, nondiscriminatory reason" for terminating plaintiff's employment.

**2.    CBP's Legitimate, Non- Discriminatory Reason**

The undisputed facts presented by way of the parties' summary judgment submissions establish that plaintiff was terminated from his employment as a direct consequence of his refusal to participate in the October 28, 2008 *Kalkines* interview, which was conducted by DHS in connection with an ongoing administrative investigation to assess his fitness for duty as a Customs and Border Protection Officer.  Plaintiff was advised in writing at the time he began his employment with CBP that his "performance, development, conduct, and general suitability for continued employment" would be assessed during a two-year internship "trial period," and that his "[e]mployment may be terminated during this time due to work performance or conduct reasons."  Deft. Exh.2 (p. 28).   He was also advised in writing, both at the outset of his employment and on the date of the *Kalkines* interview, that he had a duty to truthfully and fully respond to questions concerning matters of official interest, subject to disciplinary sanctions including removal. *See* Deft. Exh. 3 (pp. 32, 41); Deft. Exh. 21 (p. 30).  So advised, plaintiff voluntarily declined to participate in the *Kalkines* interview after just a few questions were asked, writing on the *Kalkines* form that he did not wish to continue the interview.  Deft. Exh. 21 (p. 30).

The undisputed facts further establish that Port Director Wilson made the decision to terminate plaintiff following consultation with a CBP labor relations specialist, who recommended removal as an appropriate sanction for violation of section 6.4.2 of the CBP Standards of Conduct, considering plaintiff's intern status.  *See* Deft. Exh. 24 (pp. 41-42). This recommendation was clearly within the range of sanctions outlined in the Standards

of Conduct's Table of Offenses, authorizing punishment for the offense of "[r]efusing or failing to cooperate in an official investigation or inquiry" in a range from suspension of 14 days up to and including removal. *See* Deft. Exh. 3 (p. 41).

Given this proof, the court finds that defendant has clearly and specifically articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment—namely, plaintiff's failure to fully participate in an official investigation into his conduct during the first few months of his probationary internship period, as he was required to do under the FCIP Employment Agreement and the CBP's Standards of Conduct. *Cf. Butler v. Potter*, 2011 WL 4479068, at * 2, 3, 7 (N.D.Fla. Sept. 11, 2011) (postal employee's failure to cooperate in *Kalkines* interview during official investigation despite duty to do so found to be legitimate, non-discriminatory reason for termination). Accordingly, the presumption of discrimination arising with the *prima facie* showing "drops from picture," *Weinstock*, 224 F.3d at 42, and the court turns to the question whether plaintiff has produced sufficient evidence to support a rational finding of pretext—*i.e.*, "that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge." *Van Zant v. KML Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (internal alteration omitted).

### 3.    Pretext

"Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more." *Chambers*, 43 F.3d at 38

(internal quotation marks and citation omitted).  As explained at further length by the Supreme Court:

> The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.  In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.
> …
>
> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000) (internal quotation marks, citations, and alterations omitted).  In so holding, the Court expressly rejected the "pretext plus" rule followed by some circuit courts, under which a *prima facie* case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's explanation, was routinely deemed insufficient as a matter of law to sustain a jury's finding of intentional discrimination.  *Id.* at 146.

In *James v. New York Racing Ass'n*, 233 F.3d 149 (2d Cir. 2000), the Second Circuit considered whether the holding in *Reeves* was consistent with the holding in *Fisher*, in which the circuit court rejected the proposition previously outlined in *Binder v. Long Island Lighting Co.*, 57 F.3d 193 (2d Cir. 1995)—"that evidence satisfying *McDonnell Douglas'* s minimal requirements of a *prima facie* case plus evidence from which a factfinder could

find that the employer's explanation was false necessarily requires submission to the jury." *James*, 233 F.3d at 156-57 (2d Cir. 2000). The Second Circuit reasoned that application of the *Binder* rule "would illogically permit a plaintiff to prevail notwithstanding the absence of evidence capable of supporting a finding of discrimination." *Id.* at 154. This is because the *prima facie* requirements of *McDonnell Douglas* "are so minimal that they do not necessarily support any inference of discrimination; and there are so many reasons why employers give false reasons for an adverse employment action that evidence contradicting the employer's given reason—without more—does not necessarily give logical support to an inference of discrimination." *Id.* The circuit court further recognized that in some circumstances, a *prima facie* showing plus proof of falsity might provide "powerful evidence of discrimination ... but in others, the two together might fall far short of providing evidence from which a reasonable inference of discrimination could be drawn." *Id.* "The essential point ... [is] that employers should not be held liable for discrimination in the absence of evidence supporting a reasonable finding of discrimination." *Id.* at 154-55. The court distilled from these holdings the following propositions to aid in determining whether a plaintiff's proffer is sufficient to avoid summary judgment at the pretext stage of the disparate treatment analysis:

> (i) evidence satisfying the minimal *McDonnell Douglas prima facie* case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination; (ii) once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency; (iii) the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.

*Id.* at 156-57.

Applying these propositions to the record presented on summary judgment in this case, the court finds that plaintiff's minimal *prima facie* showing, combined with his failure to come forward with any evidence from which a factfinder could rationally conclude that CBP's stated reasons for discharging him were false, falls far short of the standards outlined in *Reeves*, *Fisher*, and *James* for requiring submission of the case to a jury. First of all, beyond the circumstantial evidence found by the court to satisfy plaintiff's *prima facie* burden, plaintiff has produced no additional admissible evidence to reasonably support an inference that he was discharged because he was from Tunisia and raised as a Muslim, and not because he refused to participate in the Department of Homeland Security's investigation of his suitability for continued employment as a probationary Customs and Border Patrol Officer—as he promised to do in writing at the outset of his employment when he signed the FCIP Employment Agreement and acknowledged receipt of the CBP Standards of Conduct. Instead, plaintiff challenges the "legitimacy" of the reasons given by CBP, claiming that he was denied his constitutional due process right to a pre-termination hearing, and that the government conduct at issue fails to survive an equal protection "strict scrutiny" analysis.[8]

These impromptu challenges must be rejected, for several reasons. First and foremost, plaintiff brought this employment discrimination action pursuant to Title VII, and

---

[8]Plaintiff also contends that the FCIP Employment Agreement and CBP Standards of Conduct do not give rise to a "duty to cooperate," only a "duty to answer." This contention is rejected outright, based on the clear language of these documents and the holdings in the cases cited in the text herein. *See, e.g., Kalkines*, 473 F. 2d at 1393 (public employee "can be removed for not replying if he is adequately informed both that he is subject to discharge for not answering and that his replies (and their fruits) cannot be employed against him in a criminal case."); *cf. Butler v. Potter*, 2011 WL 4479068, at *7 (refusal to answer questions in *Kalkines* interview equated with failure to cooperate in official investigation despite duty to do so, providing legitimate non-discriminatory reason for termination of postal worker's employment).

did not allege deprivation of due process or denial of equal protection as grounds for relief in either the original or amended pleadings. Courts within the Second Circuit have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment. *See, e.g., Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001); *Levion v. Societe Generale*, 822 F. Supp. 2d 390, 399 n. 4 (S.D.N.Y. 2011) (citing cases). In any event, since probationary federal employees have no constitutionally protected property interest in continued employment, their claims for denial of their due process right to a pre-termination hearing have been routinely dismissed by the courts. *See, e.g., Mathirampuzha v. Potter*, 2010 WL 55061, at *8-9 (D.Conn. Jan. 4, 2010) (probationary postal service employee did not have entitlement to or expectation of continued employment and thus did not have protected property interest), *aff'd*, 423 F. App'x 108 (2d Cir. 2011); *Booher v. United States Postal Service*, 843 F.2d 943, 944 (6th Cir.1988) (probationary federal employee had no property interest in continued employment); *Ingalsbe v. Chertoff*, 2006 WL 908678, at *13 (N.D.Ga. Apr. 6, 2006) (no protected property interest in probationary position as TSA Security Screener).

Furthermore, the courts have limited "strict scrutiny" analysis to cases in which legislative enactment or application of government policy has drawn a classification which "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) (footnotes omitted); *Disabled American Veterans v. U.S. Dept. of Veterans Affairs*, 962 F.2d 136, 141 (2d Cir. 1992). Neither of these circumstances is present in this case.

Thus, in the absence of any further evidence to support a reasonable inference that defendant's explanation for the action it took against plaintiff was false, the court is left with the task of determining whether the probative value of plaintiff's circumstantial *prima facie* showing is sufficient to require the case to be submitted to a jury. As the discussion above reveals, plaintiff's *prima facie* evidence consists of little more than his claim, supported only by the allegations in the pleadings and his deposition testimony, that the CBP targeted him for investigation (and eventual termination) solely because of his national origin, his religious upbringing, and his association with others of similar background. In the face of defendant's clearly articulated and well-documented reasons for the actions it took, plaintiff's exclusive reliance on his *prima facie* case falls far short of the level of proof necessary to permit a rational jury to find that the defendant's reasons were false, and that plaintiff's explanation of intentional discrimination is true.

Based upon its careful scrutiny of the record in this case, developed after ample time for discovery, the court finds no admissible evidence beyond the allegations in the pleadings and plaintiff's self-serving deposition testimony that could be considered sufficient to raise the reasonable inference that plaintiff's probationary internship with CBP was terminated not because he refused to fully participate in the Department of Homeland Security's investigation of his continued suitability for employment, but because of his Tunisian national origin and Muslim upbringing. Accordingly, no rational juror could find in plaintiff's favor on his Title VII claim, and defendant is entitled to summary judgment dismissing the complaint.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Item 45) is granted, plaintiff's cross-motion for summary judgment (Item 52) is denied, and the complaint is dismissed in its entirety.  The Clerk of the Court is directed to enter final judgment in favor of defendant.

The parties shall bear their own costs.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:   11/7/2012
p:\pending\2009\09-861.oct11.2012